**John Quinlan KELLY, Esq., Plaintiff,**

**v.**

**MD BUYLINE, INC., a/k/a MDB Information Network, Larry Malcolmson, Galen Robbins, M.D., and Henry Marriott, M.D., Defendants.**

**No. 97 Civ. 0096 (KMW) (MHD).**

United States District Court,
S.D. New York.

April 1, 1998.

John Quinlan Kelly, John Quinlan Kelly & Associates, P.C., New York City, for Plaintiff.

David Kittay, Kittay, Gold & Krebsbach, White Plains, NY, for Defendant.

## OPINION and ORDER

KIMBA M. WOOD, District Judge.

Plaintiff John Q. Kelly, Esq. sues MD Buyline, Inc. ("MDB") a Texas corporation, for breach of a three-year retainer agreement. Plaintiff also asserts claims related to this retainer agreement against the individual defendants. I referred this case to Magistrate Judge Michael H. Dolinger for pre-trial supervision and to make recommendations on dispositive motions. Defendants have moved to dismiss the complaint on several different grounds. In a Report and Recommendation dated February 3, 1998 ("the Report"), Magistrate Judge Dolinger recommended that defendants' motion be granted in part and denied in part. Defendant MDB and Lawrence Malcolmson have filed timely objections to portions of the Report,[1] to which plaintiff has filed a timely response. Pursuant to 28 U.S.C. § 636(b)(1)(B), I review *de novo* those portions of the Report to which defendants object. For the reasons stated below, I adopt the Report, attached hereto.[2]

### I. *Discussion*

#### A. *The Report and Defendants' Objections*

In Magistrate Dolinger's excellent, extensively researched and carefully prepared Report, he made the following recommendations. He recommended that defendants' motion to dismiss for lack of personal jurisdiction be granted as to plaintiff's tortious interference claim against individual defendants Galen Robbins, Larry Malcolmson, and Henry Marriot, and denied as to plaintiff's contract claim against MDB and fraud claim against Malcolmson. He recommended that defendants' motion to dismiss plaintiff's remaining claims pursuant to Rule 12(b)(6) of

the Federal Rules of the Civil Procedure be denied. He also recommended that defendants' motion to dismiss on grounds of improper venue and *forum non conveniens* be denied. Defendants' principal objection is to the recommendation that their motion to dismiss plaintiff's contract claim be denied. Defendants also argue that if the contract claim is dismissed, the fraud claim should be dismissed as well. Defendants seek interlocutory appeal to the Second Circuit Court of Appeals if the Court adopts the recommendation in the Report that plaintiff has a viable contract claim. Defendants also object to the recommendation that plaintiff's fraud claim survive defendants' motion to dismiss. Because plaintiff's allegations are summarized in the Report, (*see* Report at 428–429), I shall proceed directly to defendants' objections.

#### 1. *Plaintiff's Contract Claim*

■ Defendants' principal argument is that under *In re Cooperman*, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994), the retainer agreement between plaintiff and defendant MDB is unenforceable. Defendants also argue that the retainer agreement is invalid under contract law, that the retainer agreement's termination agreement invalidates the retainer agreement, and that there is no other basis upon which to sustain plaintiff's contract claim.

#### a. *Contract Enforceability under In re Cooperman*

The central question before the New York Court of Appeals in *Cooperman* was whether an attorney's repeated use of special nonrefundable retainer fee agreements with his clients violated the Code of Professional Re-

---

1. In a letter to the Court, plaintiff asserts that defendants' objections are untimely. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure the parties have ten days to object, plus an additional three days because the Report was served by mail. *See* Fed.R.Civ.P. 6(e). Lincoln's Birthday, February 12, is excluded from computation because it is a New York State holiday. *See* Fed.R.Civ.P. 6(a) (excluding state holidays of state in which district court sits). Time begins to run the day after the Report was issued. Fed.R.Civ.P. 6(e). The start date for computation is February 3, 1998. Ex-

cluding February 7, 8, 12 (Lincoln's Birthday), 14, 15, and 16 (Washington's Birthday), the ten days expired at the close of February 23, 1998—the day defendants' objections were filed. Thus defendants' objections were timely.

2. In view of the extensive briefing of defendants' motion to dismiss for Magistrate Judge Dolinger, the thorough character of Magistrate Judge Dolinger's Report, and the quality of the briefing of objections to the Report, the Court finds that oral argument is not necessary.

sponsibility. *Cooperman*, 83 N.Y.2d at 469–70, 611 N.Y.S.2d at 466–67, 633 N.E.2d 1069. The retainer agreements provided for a minimum fee that was not refundable regardless of when the client decided to discontinue the attorney's services. *Id.* The Court of Appeals held that "use of a special nonrefundable retainer fee agreement clashes with public policy because it inappropriately compromises the right to sever the fiduciary services relationship with the lawyer." 83 N.Y.2d at 473–74, 611 N.Y.S.2d at 468, 633 N.E.2d 1069.

In his Report, Magistrate Judge Dolinger examined *Cooperman* against the background of the law governing retainer agreements between attorneys and clients. As the Report explains, the Court of Appeals has held that an attorney's right to compensation for services rendered prior to his or her termination is not limited to the fees the attorney deserves (in quantum meruit) "where an attorney is employed under a *general* retainer for a fixed period of time to perform legal services in relation to matters that may arise during the period of the contract." *See Martin v. Camp*, 219 N.Y. 170, 176, 114 N.E. 46, 48 (1916) (emphasis added). Such general retainer agreements provide that the attorney will be available for a period of time, whereas in "special" retainer agreements the attorney is hired to handle a specific case or matter. With special retainer agreements, an attorney's right to compensation for services rendered prior to his or her termination is limited to the fees the attorney deserves. *Id.*

In the instant action, plaintiff asserts that he signed a three-year contract with MDB. In this contract, plaintiff agreed to perform legal services as need by the company for a three-year period. In exchange, MDB agreed to pay plaintiff $165,000.00 for the first year, payable in monthly installments, and $180,000.00 for each of the second and third years, also in equal monthly installments. (Complaint at ¶ 16–17.) Magistrate Judge Dolinger found that this agreement was a general retainer agreement. (*See* Report at 449.) I agree.

■ Magistrate Judge Dolinger concluded that the New York Court of Appeals's deci-

sion in *Cooperman* applied only to nonrefundability provisions in special retainer agreements, not to non-refundability provisions in general retainer agreements. (*See* Report at 447–448.) In his analysis, Magistrate Judge Dolinger confronted the language in *Cooperman* that defendants claim mandates granting their motion to dismiss. That language is as follows:

> Our holding today makes the conduct of trading in special nonrefundable retainer fee agreements subject to appropriate professional discipline. Moreover, we intend no effect or disturbance with respect to other types of appropriate and ethical fee agreements (see, Brickman and Cunningham, Nonrefundable Retainers Revisited, 72 NCLRev 1, 6 [1993]). Minimum fee arrangements and *general retainers that provide for fees, not laden with the nonrefundability impediment irrespective of any services*, will continue to be valid and not subject in and of themselves to professional discipline.

*Cooperman*, 83 N.Y.2d at 476, 611 N.Y.S.2d at 470, 633 N.E.2d 1069 (Report at 448). Magistrate Judge Dolinger carefully explained why, despite the language emphasized in this passage, the prohibition in the *Cooperman* decision is limited to nonrefundability provisions in special retainer agreements. Defendants urge that the emphasized language clearly establishes that a general retainer with a nonrefundability provision is invalid.

In view of the fact that the *Cooperman* court scrupulously (and consistently) identifies the issue before the court as the use of "special" nonrefundable retainer free agreements, *see Cooperman*, 83 N.Y.2d at 469, 471, 473, 475, 476, 611 N.Y.S.2d at 466, 467, 469, 470, 633 N.E.2d 1069, it is not plausible to read the *Cooperman* decision as overruling, *sub silencio*, the line of authority that establishes the difference in damages available for special and general retainer provisions. For this reason, and the other reasons set forth in the Report, (*see* Report 447–450), which more than adequately addresses the issues raised in defendants' objections to the Report, I find that *Cooperman* does not compel dismissing plaintiff's contract claim.

### b. *Is Retainer Agreement Otherwise Enforceable?*

Defendants argue that the retainer agreement between plaintiff and defendant MDB is unenforceable, as a matter of law, under contract principles. In support of this contention, defendants principally rely on *Joel R. Brandes, P.C. v. Zingmond*, 573 N.Y.S.2d 579, 586, 151 Misc.2d 671 (Sup.Ct. 1991). In *Brandes*, the court held that a nonrefundable matrimonial retainer agreement was not enforceable. *Id.* Among other grounds, the Court reasoned that enforcing the agreement, which provided for a $15,000 nonrefundable fee, would significantly chill the right of the client to discharge his or her lawyer. *Id.* at 583, 151 Misc.2d 671.

However, the retainer agreement at issue in the instant case is not controlled by *Brandes*. Outside the context of disciplinary actions, the New York courts continue to treat general retainer agreements differently from special retainer agreements in contract actions. *Cf. Ehrlich v. Rebco Ins. Exchange Ltd.*, 198 A.D.2d 58, 58, 604 N.Y.S.2d 729, 729 (App.Div. 1st Dep't 1993) (holding that issues of fact remained as to whether there was a "general retainer" which would except plaintiff from rule limiting attorneys' recovery in quantum meruit). Accordingly, general contract principles do not invalidate the retainer agreement at issue here.

Defendants also argue that under *Cohen v. Radio–Electronics Officers Union*, 146 N.J. 140, 679 A.2d 1188 (1996), the retainer agreement is unenforceable because the notice of termination provision is excessive. In *Cohen* the Supreme Court of New Jersey held that, in the circumstances of that case, a provision for six-months notice of termination excessively burdened the client's right to hire and to discharge his lawyer. *Cohen*, 146 N.J. at 160, 679 A.2d at 1198. However, the *Cohen* court still allowed Cohen to recover in quantum meruit for the reasonable value of the services that he provided. 146 N.J. at 164–65, 679 A.2d at 1200. The *Cohen* court held that in quantum meruit services included the cost for reasonable notice of termination, which the court calculated as one-month's notice of termination. *Id.* *Cohen* does not stand for the proposition that any retainer agreement with a six-month notice of termination provision is invalid. In the circumstances of this case, the Court is not prepared to find that the retainer agreement is invalid solely on the basis of its six-month notice of termination provision.

Because the Court does not find that plaintiff's contract claim to enforce the retainer agreement presents a controlling question of law as to which there is substantial ground for difference of opinion, the Court declines defendants' request to certify this issue for interlocutory appeal pursuant to 28 U.S.C. § 1292.

### 2. *Plaintiff's Fraud Claim*

Defendants argue that the Report errs in upholding plaintiff's fraud claim, because, defendants claim, it arises out of the same facts that support the breach of contract claim. Defendants also assert that the Report errs in finding that plaintiff's allegations to justify discovery. Because I find that the issues raised in defendants' arguments are addressed in the Report, (*see* Report at 433–439), and I agree with their treatment in the Report, I see no utility in further discussion of them here.

### II. *Conclusion*

For the reasons stated above as well as those stated in the Report, I grant defendants' motion to dismiss for lack of personal jurisdiction as to plaintiff's tortious interference claim against individual defendants Galen Robbins, Larry Malcolmson, and Henry Marriot, and deny that motion as to plaintiff's contract claim against MDB and fraud claim against Malcolmson. However, I deny defendants' motion to dismiss plaintiff's other claims pursuant to Rule 12(b)(6) of the Federal Rules of the Civil Procedure, and defendants' motion to dismiss on grounds of improper venue and *forum non conveniens*. I also deny defendants' motion for interlocutory appeal pursuant to 28 U.S.C. § 1292, and defendants' request for oral argument on their motion to dismiss. The parties are directed to submit a revised scheduling order to Magistrate Judge Dolinger by April 16, 1998, or as directed by Magistrate Judge

Dolinger, which scheduling order sets this case as ready for trial by June 22, 1998.

SO ORDERED.

## *REPORT & RECOMMENDATION*

DOLINGER, United States Magistrate Judge.

John Q. Kelly, Esq. is an attorney practicing in the State of New York. In 1995 he entered into a three-year retainer agreement with a Texas corporation known as MD Buyline, Inc. ("MDB"). Fourteen months later, in December 1996, MDB repudiated the agreement, thus triggering the current lawsuit.

In this diversity action, Kelly sues MDB for breach of the agreement. He also pursues related claims against three individual defendants. He sues Larry Malcolmson, MDB's President and Chief Executive Officer, for fraud in connection with an amendment of the same contract, and asserts a claim against three officers and controlling shareholders of MDB—Malcolmson, Dr. Galen Robbins and Dr. Henry Marriott—for tortious interference with the contractual relationship between him and MDB.

In response, defendants have moved to dismiss the complaint in its entirety on three grounds. First, they argue that they are not subject to the jurisdiction of this court, since they are all domiciled in other states and purportedly have had no contacts with New York that are relevant to plaintiff's claims. Second, they assert that this is not the proper venue for this suit because the pertinent events occurred elsewhere or, alternatively, that the case should be transferred to the Northern District of Texas for the convenience of the parties and witnesses. Third, they seek dismissal of the complaint for failure to state a claim upon which relief can be granted, targeting particularly plaintiff's contract-breach claim on the basis that the three-year retainer is unenforceable under public policy recognized by the New York courts.

For the reasons that follow, I recommend that the motion to dismiss for lack of personal jurisdiction be granted with respect to the tortious interference claim against Robbins,

Marriott and Malcolmson and denied with respect to the contract claim against MDB and the fraud claim against Malcolmson. I further recommend that the venue, *forum non conveniens* and Rule 12(b)(6) defenses be rejected with respect to the remaining claims.

### I. *Plaintiff's Allegations*

Plaintiff is a New York City attorney. In his complaint he alleges that in 1992 he entered into an agreement with MDB, a Texas-based company, to provide legal services for "a fixed annual fee, payable in monthly increments." (Complaint at ¶ 16). According to plaintiff, on or about October 25, 1995 he and MDB signed a three-year contract under which he agreed to continue to provide legal services, as needed by the company. In return, MDB committed itself to pay him $165,000.00 for the first year, payable in monthly installments of $13,750.00, and to pay him $180,000.00 for each of the second and third years, in monthly installments of $15,000.00. (*Id.* at ¶ 17). Under this agreement, as later revised, plaintiff performed a variety of legal services for the client until December 1996. (*Id.* at ¶¶ 18–19, 27).

Plaintiff asserts that in September 1996 defendant Malcolmson, who is a substantial shareholder of MDB as well as its President and Chief Executive Officer, telephoned him and requested that he accept a reduction to $150,000.00 in his annual pay for the second and third years of the contract term because MDB was encountering financial difficulties. Plaintiff agreed to the reduction. (*Id.* at ¶ 21).

According to Kelly, beginning in September 1996 he undertook legal representation of another client in a civil case in California, but arranged for other attorneys to share the responsibility for that lawsuit in order to ensure his availability for any work required by MDB. (*Id.* at ¶¶ 23–24). Despite Kelly's alleged availability, he reports that on November 5, 1996 Malcolmson informed him in writing that MDB would cease making payments under the contract, assertedly because Kelly had been unavailable for six weeks, presumably while he was in California. (*Id.*

at ¶ 25). Plaintiff insists that this complaint was baseless, and in fact Malcolmson subsequently agreed to resume payments. (*Id.* at ¶¶ 26–27).

In apparent reliance on this promise to resume payments, Kelly allegedly performed additional services for the company. Nonetheless, no payments were forthcoming from MDB, and the company officially terminated the agreement on or about December 13, 1996 without having made any payments since October 1996. (*Id.* at ¶ 27–28).

Based on these allegations, plaintiff asserts three claims. His first is that MDB breached the three-year retainer agreement by terminating it after less than fourteen months and by failing to pay him beyond the thirteenth month of the contractual relationship. (*Id.* at ¶¶ 30–32).

Plaintiff next articulates a fraud claim against Malcolmson. This claim is based on the allegation that in September 1996 Malcolmson induced him to accept a decrease in his contractually guaranteed fee for the remaining two years of the retainer agreement by a deliberate misrepresentation to the effect that, if he agreed, MDB would make all required payments without interruption and that the contract would remain in force to the end of its term. According to plaintiff, Malcolmson made this offer to enhance the market value of the MDB shares while he and his fellow shareholders sought to sell the company. Kelly further alleges that Malcolmson knew at the time that MDB would not honor the contract and fraudulently induced him to accept the contractual modification. (*Id.* at ¶¶ 34–39).

Plaintiff's third claim is asserted against Malcolmson and Drs. Robbins and Marriott, who are identified as the other principal shareholders of the company. (*Id.* at ¶¶ 13–14, 41). Kelly claims that the three shareholders engaged in tortious interference with his contractual relationship with MDB. Specifically, he alleges that they manufactured a baseless complaint that he had not been available to provide services to the company during a six-week period in the Autumn of 1996 and then arranged for the corporation to terminate its retainer relationship with

him, in violation of the asserted terms of the contract. (*Id.* at ¶¶ 42–49).

## II. *ANALYSIS*

As noted, defendants have launched a multi-pronged attack on the complaint, challenging personal jurisdiction, venue and the legal adequacy of the claims. I address these arguments in the order in which they are presented.

### A. *Personal Jurisdiction*

Defendants first argue that this Court does not have personal jurisdiction over them. In a diversity case, we must look to the forum state's long-arm statute to determine whether personal jurisdiction exists over a non-resident defendant. *E.g., Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.) *cert. denied,* — U.S. —, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996); *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 222–25 (2d Cir. 1963) (en banc). If the relevant statute authorizes the assertion of such jurisdiction, the court must then decide whether the exercise of that jurisdiction would comport with federal standards of due process. *E.g., Metropolitan Life,* 84 F.3d at 567 (citing *Arrowsmith,* 320 F.2d at 223).

When jurisdiction is challenged, the plaintiff must carry the burden of showing that the defendant is subject to the court's jurisdiction. *E.g., Metropolitan Life Ins. Co.,* 84 F.3d at 566. The extent of that burden varies, however, depending upon the procedural posture of the case. *E.g., Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

In this case defendants' jurisdictional challenge precedes any pretrial discovery. Prior to discovery, the plaintiff need only make legally sufficient allegations of jurisdiction to defeat a motion to dismiss. *E.g., New Moon Shipping Co. Ltd. v. Man B & W Diesel Ag,* 121 F.3d 24, 29 (2d Cir.1997); *Metropolitan Life,* 84 F.3d at 566–67. In assessing such a challenge, the court should assume the truth of all well-pled jurisdictional allegations found in the complaint or in

supporting affidavits offered by the plaintiff, *see, e.g., PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997), and should read any ambiguities in those allegations in a light favorable to the plaintiff. *See, e.g., CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986).

Applying these standards, we address separately the jurisdictional arguments of each of the defendants.

### 1. *MDB*

■ Plaintiff's contract-breach claim is asserted solely against MDB. In seeking dismissal for lack of jurisdiction, the company relies upon representations by Malcolmson to the effect that MDB is incorporated and based in Texas and "has neither transacted business in New York from which Kelly's claim arose nor contracted to supply goods and services to New York from which Kelly's claim arose." (Declaration of Larry Malcolmson, executed Feb. 9, 1997, at ¶ 9). For reasons to be noted, plaintiff has adequately alleged a factual basis to invoke the personal jurisdiction of this court over MDB.

The pertinent statutory provision is section 302(a)(1) of the New York Civil Practice Law and Rules, which subjects a foreign corporation to personal jurisdiction if it "transacts any business within the state," provided that the claim asserted against the corporation arose from such transaction of business. N.Y. C.P.L.R. § 302(a)(1) (McKinney 1997). "Although not requiring regular and systematic activities, the transacting business test requires 'some purposeful activity within the state giving rise to at least some minimum contacts between the forum and the party over whom it is asserting jurisdiction.'" *Metropolitan Air Service, Inc. v. Penberthy Aircraft Leasing Co.,* 648 F.Supp. 1153, 1155 (S.D.N.Y.1986) (quoting, *inter alia, Chemco Int'l Leasing, Inc. v. Meridian Engineering Inc.,* 590 F.Supp. 539, 541 (S.D.N.Y.1984)). "Where [,however,] the activities were purposeful and a substantial relationship exists between the transaction and the claim assert-

ed, jurisdiction may be invoked even if the defendant never physically enters New York." *Otterbourg, Steindler, Houston & Rosen, P.C. v. Shreve City Apts., Ltd.,* 147 A.D.2d 327, 330, 543 N.Y.S.2d 978, 980 (1st Dep't 1989). *See, e.g., Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 13, 308 N.Y.S.2d 337, 337, 256 N.E.2d 506 (1970); *Sluys v. Hand,* 831 F.Supp. 321, 324 (S.D.N.Y.1993). Moreover, in a contract-breach case, even if the alleged breach takes place in another state, the courts will generally find a substantial relationship if the contract itself either was negotiated in New York or contemplated significant performance activities by the plaintiff in this state. *See, e.g., Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 31 (2d Cir.1996) (applying *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 59 (2d Cir. 1985)).

The New York courts have debated for some time the question of whether an out-of-state party's retention of a New York attorney in and of itself constitutes a transaction of business in the state under section 302(a)(1) when the attorney seeks to sue the client. *See Reiner v. Durand,* 602 F.Supp. 849, 852 (S.D.N.Y.1985) (citing cases on both sides).[1] Nonetheless, jurisdiction is generally upheld if the defendant has had additional contacts with the state relating to the retainer agreement. *See, e.g., Colucci & Umans v. 1 Mark, Inc.,* 224 A.D.2d 243, 637 N.Y.S.2d 705, 706 (1st Dep't 1996) (defendant's contacts with New York included retention of a New York law firm to represent it in a New York legal proceeding, telephonic participation in that proceeding and visits to New York by defendant's registered agents); *Otterbourg, Steindler,* 147 A.D.2d at 332, 543 N.Y.S.2d at 981 (defendant's contacts included retention of New York counsel, ninety-three telephone calls to counsel, participation in settlement negotiations by means of a conference call with an open telephone line with New York and the settlement of aspects of a New York bankruptcy proceeding); *Reiner,* 602 F.Supp. at 852 (defendants' con-

---

1. There seems to be little question that the retention of an attorney in New York will suffice to permit the invocation of jurisdiction for related claims by another party against the client. *See,* *e.g., PDK Labs., Inc.,* 103 F.3d at 1109; *Barclays American/Business Credit, Inc. v. Boulware,* 151 A.D.2d 330, 330, 542 N.Y.S.2d 587, 587–88 (1st Dep't 1989).

tacts included retention of New York counsel, who rendered services to defendant in New York and who met with defendants' agent on several occasions).

In this case, plaintiff's allegations amply meet that test. Although the 1995 retainer agreement was signed in Texas, Kelly alleges that Malcolmson, on behalf of the company, came to New York and discussed with him the terms of the agreement prior to its execution. (Affidavit of John Q. Kelly, Esq., sworn to March 24, 1997, at ¶ 14). Kelly also represents that all of the legal services that he provided under the 1995 agreement were performed in New York, as were almost of all of his activities for the company under the prior arrangement. (Kelly Aff. at ¶¶ 4–6). Much, if not all, of this work was initiated by MDB by written communications sent to Kelly in New York. (*Id.* at Exs. B, C, G & H). Moreover, one of the tasks performed by Kelly for MDB was the filing of a lawsuit in New York against one of its many New York-based clients. (*Id.* at ¶ 8(j) & Ex. I).[2] In addition, Kelly notes that defendant has many customers in New York (*id.* at ¶ 11), as well as a corporate representative based here (*id.* at ¶ 12), and we may surmise that this locus of part of MDB's business influenced the corporate decision to retain counsel here. Finally, we note that the termination of the retainer, purportedly in breach of its terms, was accomplished by Malcolmson sending a letter to Kelly in New York. (*See* Kelly Aff., Ex. P).

This set of allegations, if sustained, would suffice to establish that MDB transacted business in New York and that the claim by plaintiff is substantially related to these transactions. *See, e.g., Otterbourg, Steindler,* 147 A.D.2d at 331, 543 N.Y.S.2d at 981–82 (discussing *Elman v. Belson,* 32 A.D.2d 422, 302 N.Y.S.2d 961 (2d Dep't 1969)). *See also Colucci & Umans,* 224 A.D.2d at 243, 637 N.Y.S.2d at 706; *Murray, Hollander, Sullivan & Bass v. Hem Research, Inc.,* 111 A.D.2d 63, 65, 489 N.Y.S.2d 187, 190 (1st Dep't 1985). *Compare Amins v. Life Support Medical Equip. Corp.,* 373 F.Supp. 654,

657–58 (E.D.N.Y.1974) (New York attorney's services could have been performed anywhere, and defendant's contacts with counsel in New York were substantially unrelated to the services for which he was seeking payment of fees).

■ Since plaintiff has adequately pled a factual basis for personal jurisdiction over MDB under section 302(a)(1), we turn to whether the exercise of that jurisdiction would comport with due-process standards. As suggested by the court in *Metropolitan Air Service,* satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements. 648 F.Supp. at 1155. These constitutional requirements are fulfilled when the assertion of jurisdiction is based on at least "certain minimum contacts" by the defendant with the state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Chaiken v. VV Pub. Corp.,* 119 F.3d 1018, 1027 (2d Cir.1997) (quoting *inter alia Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)(quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945))).

To demonstrate the requisite "minimum contacts," plaintiff must first show that the suit arises out of, or relates to, the defendant's contacts with the forum state. *See, e.g., id.* at 1028 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). That is the case here. As noted, Kelly's breach-of-contract claim clearly arises out of the retainer contract and MDB's interactions with him under it, most of which occurred while he was in New York. Indeed, the contract and the related communications between MDB and Kelly are inextricably connected with New York State.

As part of our due-process analysis, we must also look to whether the defendant "purposefully availed [itself] of the forum and should have reasonably foreseen having been haled into court here." *See, e.g., id.* at 1028

---

**2.** Although MDB asserts that Kelly filed the New York lawsuit without client authorization (*see* Declaration of Larry Malcolmson, executed April 12, 1997, at ¶ 3), that contention appears to be in dispute (*see* Pl.'s Mem. in Opp. at 12), and hence we must assume for present purposes that the filing was with defendant's permission.

(citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Plaintiff also satisfies this test.

The company decided to retain a New York attorney to handle a broad array of legal matters for it. Moreover, as noted, we may fairly infer that this selection was not coincidental, since defendant apparently has a significant array of clients in New York (Kelly Aff. at ¶ 11), and a corporate representative was based in New York during the relevant time. (*Id.* at ¶ 12).[3] Given the substantiality of MDB's business in New York, it presumably anticipated that retaining legal counsel here would be advantageous to it. And in fact this assumption was seemingly borne out by the various services that Kelly allegedly performed here, including not only the negotiation of business transactions, but the institution of litigation against a local customer of the company.

 In assessing the reasonableness of requiring defendant to litigate this case here—the "fair play" inquiry—we consider a variety of factors, including the burden on the parties of litigating here or in Texas and public-interest considerations. *See, e.g., Chaiken,* 119 F.3d at 1028 (citing, *inter alia, Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 113–14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). In this regard, we note that MDB does not suggest, much less demonstrate, that the exercise of jurisdiction by this court would impose any unreasonable burden on it. Moreover, New York has a substantial interest in regulating the manner in which New York attorneys may contract with clients and the extent of their rights under such contracts. *See generally Middlesex County Ethics Comm. v. Garden,* 457 U.S. 423, 434, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *United States v. Cantor,* 897

F.Supp. 110, 115 (S.D.N.Y.1995). Plaintiff also has a significant interest in obtaining a convenient and efficient adjudication of his claim against his erstwhile client, a goal that will best be served by permitting the pending proceeding to go forward here. We also note that the public interest in efficiently allocating scarce judicial resources counsels us to avoid the inevitable delays and duplication of efforts that would be entailed in requiring plaintiff to refile in Texas. Finally, defendants make no suggestion that the public policies of either New York or Texas would be subverted by requiring this matter to be adjudicated in this district. *See generally World–Wide Volkswagen,* 444 U.S. at 292; *Chaiken,* 119 F.3d at 1028.

In sum, we conclude that this court may exercise *in personam* jurisdiction over MDB for the purpose of adjudicating plaintiff's breach-of-contract claim.

### 2. *The Individual Defendants*

Kelly asserts two tort claims against the individual defendants. Against Malcolmson he presses a common-law fraud claim. He also asserts a claim for tortious interference with contract against all three individual defendants.

In support of their motion to dismiss, each of the three individual defendants has executed a declaration noting that he is a resident of another state[4] and alleging that he has never travelled to New York for a purpose related to the claims that Kelly is now asserting. (Malcolmson Decl. at ¶¶ 8, 11, 13; Robbins Decl. at ¶¶ 5, 8–10; Marriott Decl. at ¶¶ 5, 9, 11). Each also avers that he owns no property in New York and has not engaged in personal business on a continuing basis in this state. (Malcolmson Decl. at ¶¶ 5, 7, 10; Robbins Decl. at ¶¶ 5, 7, 8, 9; Marriott Decl. at ¶¶ 5, 7, 8).

---

**3.** Because of our conclusion that defendant had sufficient contacts with New York to satisfy section 302(1)(1), we need not consider whether the presence here of a representative of the company triggers jurisdiction under section 301. *See generally Kulas v. Adachi,* 1997 WL 256957, at *3 (S.D.N.Y. May 16, 1997).

**4.** Malcolmson is domiciled in Arizona, although he refers to his "legal residence" as being in Texas. (Malcolmson Decl. at ¶ 3). Dr. Robbins is a resident of Oklahoma. (Declaration of Dr. Galen Robbins, executed Feb. 10, 1997, at ¶ 3). Dr. Marriott is a resident of Florida. (Declaration of Dr. Henry, Marriott, executed Feb. 10, 1997, at ¶ 3).

In defending his invocation of jurisdiction over the three defendants, Kelly relies exclusively on N.Y.C.P.L.R. § 302(a)(3) (McKinney 1997). That section authorizes New York courts to assert personal jurisdiction over a non-resident defendant who has committed a tortious act outside New York State that causes injury within the state, if the defendant either

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

Since the application of this provision varies somewhat depending upon the nature of the claim in question, we separately address jurisdiction based on the fraud claim and the tortious-interference claim.

(a) Fraud—Jurisdiction Over Malcolmson

Kelly's fraud claim is based on his contention that in September 1996 Malcolmson persuaded him to agree to a reduction in his fee for the second and third years of the retainer agreement by falsely assuring him that MDB would honor the contract for its full term. According to Kelly, Malcolmson knew at the time that MDB would eventually repudiate the contract, and he made the misrepresentation to induce plaintiff to agree to a decrease in MDB's fee obligation, thereby enhancing the value of his ownership interest in the company.

From plaintiff's affidavit it appears that this alleged misrepresentation occurred in the course of a telephone conversation between Malcolmson in Texas and plaintiff in New York. (Kelly Aff. at ¶ 20; *see* Complaint at ¶ 21). Plaintiff indicates that he relied on the assurance by the defendant, and that that reliance was reflected in his agreement to a letter of modification mailed to him in New York for his signature. (Kelly Aff. at ¶ 21; Complaint at ¶ 21 & Ex. B).

Based on these allegations it could be argued that the alleged tort was committed in New York, in the sense that the fraud involved misleading plaintiff, and that the intended effect, and thus plaintiff's reliance, took place in New York. *See Polish v. Threshold Technology Inc.*, 72 Misc.2d 610, 612, 340 N.Y.S.2d 354, 356 (1972) (citing *Noved Realty Corp. v. A.A.P. Co.*, 250 A.D. 1, 6, 293 N.Y.S. 336, 341 (1st Dep't 1937)). If so construed, plaintiff's allegations would trigger section 302(a)(2) of the CPLR, and permit assertion of jurisdiction over Malcolmson because that provision covers any tort committed within the state.

■ New York case law has not developed in this direction, however, and instead the jurisdictional provision governing torts committed within the state has generally been construed as limited to acts committed while the defendant is physically present within the state. *See* N.Y.C.P.L.R. § 302, J. McLaughlin *Practice Commentaries* C302:17 at 103 (McKinney 1990) (discussing *Feathers v. McLucas*, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965)). Indeed, the decision in *McLucas* and the subsequent, if more cryptic, decision in *Kramer v. Vogl*, 17 N.Y.2d 27, 32, 267 N.Y.S.2d 900, 904, 215 N.E.2d 159 (1966) (holding that misrepresentation by Austrian defendant to New York plaintiff was not tort committed in New York),[5] ap-

---

**5.** The precise holding in *Kramer* on this issue is somewhat obscure for two reasons. First, it is not clear from the opinion where the plaintiff was when the defendant communicated the allegedly fraudulent statement to him. From the discussion in *Polish* it appears that the original misrepresentation in *Kramer* may have been made during a conversation between the parties when neither was in New York, and that it was later embodied in a letter sent from Austria to New York. *See Polish*, 72 Misc.2d at 612, 340 N.Y.S.2d at 356. Second, the plaintiff in *Kramer* apparently based his jurisdictional argument on the fact that the defendant had shipped certain goods into the state, not on the fact that the defendant had communicated a false statement to the plaintiff in New York. *See* 17 N.Y.2d at 31, 267 N.Y.S.2d at 903, 215 N.E.2d 159. Despite these imponderables, courts have since cited *Kramer* for the proposition that fraudulent statements communicated to New York from outside the state do not amount to torts committed within the state. *See Mije Assoc. v. Halliburton Services*, 552 F.Supp. 418, 420 n. 5 (S.D.N.Y. 1982); *Marine Midland Bank v. Keplinger & Assoc., Inc.*, 488 F.Supp. 699, 703 (S.D.N.Y.1980);

parently triggered the 1966 revision to section 302, which added subsection 302(a)(3) and thus expanded jurisdiction to torts committed outside the state in defined circumstances. *See* N.Y.C.P.L.R. § 302, *Practice Commentaries* C302:17 & 19 at 104–05. Consistent with this history, the courts recognize that a fraudulent statement made outside New York and directed to a person in New York is a tort committed outside the state and must be assessed under section 302(a)(3). *See, e.g., Cooper v. Parsky,* 1997 WL 242534, at *12 (S.D.N.Y. Jan.8, 1997); *Pell v. Clarke,* 1994 WL 74075, at *3–5 (S.D.N.Y. March 9, 1994); *Cavalier Label Co., Inc. v. Polytam, Ltd.,* 687 F.Supp. 872, 879 (S.D.N.Y.1988); *Cleopatra Kohlique, Inc. v. New High Glass, Inc.,* 652 F.Supp. 1254, 1256 (E.D.N.Y.1987). *But see Banco Nacional Ultramarino, S.A. v. Chan,* 169 Misc.2d 182, 187–88, 641 N.Y.S.2d 1006, 1009–10 (1996), *aff'd,* 240 A.D.2d 253, 659 N.Y.S.2d 734 (1st Dep't 1997); N.Y.C.P.L.R. § 302, Vincent C. Alexander, *Practice Commentaries* C:302:17 at 20 (McKinney Supp. 1997).

■ We therefore consider the application of section 302(a)(3) to plaintiff's fraud allegations. The first question is whether plaintiff has in fact adequately pled the commission of a tort. *See generally Kulas,* 1997 WL 256957, at *8–9 (looking to adequacy of fraud allegation when assessing claimed jurisdiction under section 302(a)(3)). We conclude that he has done so.

■ As noted, Kelly asserts that he was induced to agree to a reduction in his annual fee by a knowing false representation by Malcolmson that if he did so, MDB would pay that fee without interruption for the remaining two years of the contract. Plaintiff thus alleges both a deliberately false statement by the defendant and reasonable reliance by him to his detriment. That appears to meet the recognized criteria for pleading a claim of common-law fraud. *See, e.g., Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995).

In resisting this conclusion, Malcolmson presses two arguments. First, he asserts that these allegations amount simply to a claim for breach of the retainer contract, and that New York law precludes reasserting a garden-variety breach claim as one sounding in fraud. (Defs' Mem. at 7–8). Second, he appears to argue that a corporate officer cannot be held liable in fraud for misstating the intention of his corporation to fulfill its contractual obligations. (*Id.* at 8). Neither argument is persuasive in the context of this case. I address each in turn.

Defendant relies on the commonly accepted rule under New York law that " 'mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement.' " *Kulas,* 1997 WL 256957, at *9 (quoting *Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 61–62 (S.D.N.Y. 1994)). If the fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996) (quoting *McKernin v. Fanny Farmer Candy Shops, Inc.,* 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991)). *See, e.g., Int'l CableTel, Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 486–90 (S.D.N.Y.1997).

This principle does not, however, preclude all fraud claims based upon knowingly false statements of intent by a contracting party when offered as an inducement to enter into a contract. *See Bridgestone/Firestone,* 98 F.3d at 20 (citing cases); *PI, Inc. v. Quality Products, Inc.,* 907 F.Supp. 752, 760 (S.D.N.Y.1995) (citing cases). As summarized by the Second Circuit in *Bridgestone/Firestone,* a fraud claim will lie if the plaintiff can "(i) demonstrate a legal duty separate from the duty to perform under the contract ... or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract ... or (iii) seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages...." 98 F.3d at 20.

*Dogan v. Harbert Const. Corp.,* 507 F.Supp. 254, 262 (S.D.N.Y.1980).

In this case Malcolmson's alleged misrepresentation did not occur in connection with the execution of the 1995 retainer agreement, nor did it necessarily amount to an assurance that MDB intended to comply with its legal obligations under that contract. Rather, the statement was assertedly offered as an inducement to persuade plaintiff to forego a portion of the consideration that he might have been entitled to receive under the existing agreement. Moreover, if we credit MDB's legal position that the three-year term of the 1995 agreement was unenforceable as against public policy [6], Malcolmson's alleged statement promised more than that MDB would fulfill its contractual obligations. Under these circumstances, then, that representation was at least arguably collateral to the 1995 contract.

We may infer, however, that Malcolmson would respond to this analysis by arguing that the September 1996 interchange between him and plaintiff—at least as alleged by plaintiff—amounted to a new contract, under which MDB agreed to pay plaintiff for the next two years and to do so in a timely fashion if plaintiff would agree to reduce his fee. Under that construction, defendant would presumably contend, plaintiff's allegations amount only to an assertion that the company failed to perform its part of the 1996 agreement and hence may be permissibly pled only as a contract claim.

There are two answers to this contention. First, defendants take the position that even if a retainer agreement between an attorney and a client provides for a specific term, any provision that would purport to bind the client to pay the attorney for the full term irrespective of whether the client wishes to terminate the relationship earlier is unenforceable as against public policy. *See* pp. 444–452, *infra.* If this view is correct, then plaintiff cannot assert a claim for breach of the purported 1996 contract, and hence his

fraud allegations cannot be subsumed in a breach claim. Rather, what plaintiff would be left with is a claim for a non-contractual misrepresentation that induced him to surrender a portion of the compensation to which he would otherwise have been entitled during the admittedly brief period between the September 1996 modification agreement and MDB's termination of the retainer arrangement three months later.[7]

Second, even if we assume that plaintiff could sue for a breach of the alleged 1996 agreement, he would be limited to contract damages, that is, the loss of two years' of fees calculated at the lower rate embodied in the 1996 agreement. *See Jones v. Dunkirk Radiator Corp.,* 21 F.3d 18, 22 (2d Cir.1994); *Sudul,* 917 F.Supp. at 1046. In contrast, fraud damages encompass the value of whatever was surrendered in reliance on the misrepresentation, *see generally Kulas,* 1997 WL 256957, at \*10 (citing, *inter alia, Lama Holding v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996); *Sager v. Friedman,* 270 N.Y. 472, 481, 1 N.E.2d 971, 973 (1936)), which in this case would at least arguably include the thirty thousand dollars in annual fees that Kelly agreed to forego in reliance on the assertedly false statement of Malcolmson. Again, this appears to fit comfortably within the scope of a permissible fraudulent-inducement claim under New York law. *See Bridgestone,* 98 F.3d at 20 (citing *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89–90, 502 N.E.2d 1003 (1986)); *Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 541 (S.D.N.Y.1997).

Malcolmson's second argument—that a corporate officer cannot be held liable for misrepresenting the intention of his company to perform its contractual obligations—is also misguided in this context.

---

**6.** *See* pp. 444–452, *infra.*

**7.** An argument might also be fashioned by defendant that the 1996 agreement was in any event illusory since, under defendants' view of New York law governing retainer contracts—to be discussed in a succeeding section of this Report and Recommendation—the client always retained the

right to terminate the contract. Under this approach there was no valid consideration and hence no binding contract. *See Allen v. West-Point–Pepperell, Inc.,* 1996 WL 2004, at \*6 n. 5 (S.D.N.Y. Jan.3, 1996); *cf. Dorman v. Cohen,* 66 A.D.2d 411, 418–419, 413 N.Y.S.2d 377, 382–383 (1st Dep't 1979). This too would undercut a contract claim, but not necessarily a fraud claim.

For legal authority defendant cites *PI, Inc.*, 907 F.Supp. at 762, which states that "A corporate officer does not commit a tort by promising that his corporation will fulfill its express contractual promises." Although Malcolmson's assumptions in making this argument are not explicitly stated, he appears to read the quoted observation in *PI* as recognizing some form of tort immunity for a corporate officer if he was acting within the scope of his corporate duties. (*See* Defs' Mem. at 8; Defs' Reply Mem. at 12).

■ Defendant errs in this respect. The passage that he cites, when read in context, is plainly not intended to create a separate obstacle to tort liability based on the status of the speaker *as a corporate officer.* Rather, Judge Sand's point is simply that, as we have noted, New York law does not recognize a separate form of tort liability based on a misrepresentation as to the intention of the contracting party to meet its contractual obligations, and his reference to a corporate officer in *PI* is simply a specific application of that general proposition. Indeed, this is underscored by his citation of *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1177 (2d Cir. 1993), which he then accurately characterizes as follows in a parenthetical:

> (finding that a corporate director had not committed a tort by representing that his corporation would perform its contractual duties; stating that "[e]very party to a contract commits himself to good faith performance. That does not transmute a breach of contract into a tort.").

*PI, Inc.*, 907 F.Supp. at 762. Following this citation and quotation of *Mills*, the court in *PI* simply reiterates its preceding conclusion that the plaintiff's fraud claim failed because it was not distinguishable from a contract-breach claim. *Id.*

Defendant cites no controlling legal authority, and we are aware of none, for the proposition that a corporate officer or director (or in this case a principal shareholder) cannot be liable in fraud for knowingly making fraudulent statements while performing corporate functions. We must therefore infer, at least for present purposes, that plaintiff has stated a viable fraud claim and thus met the first requirement for jurisdiction under section 302(a)(3) of the CPLR.

■ The next question is whether, assuming the truth of plaintiff's allegations, he also satisfies the statutory requirement that the out-of-state tort have caused injury within New York. Again, we conclude that he has done so.

In arguing that plaintiff's injury occurred elsewhere, defendant invokes the familiar principle that injury will not be deemed to have occurred in New York merely because the plaintiff is domiciled here. *See, e.g., American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 432–33 (2d Cir.1971) (situs of commercial injury lies, not where plaintiff's primary place of business is located, but where plaintiff has lost business); *Cosmetech Int'l, LLC v. Der Kwei Enter. & Co.*, 943 F.Supp. 311, 319 (S.D.N.Y. 1996). The governing rule under section 302(a)(3) is that "it is not enough to show an 'indirect financial loss resulting from the fact that the injured person resides or is domiciled' in this state." *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980) (quoting *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 787, 402 N.E.2d 122 (1980)). That rule, however, does not preclude assertion of jurisdiction over Malcolmson on the fraud claim.

According to plaintiff, the defendant communicated a fraudulent statement to him in New York with the purpose and effect of misleading him into surrendering a portion of his entitlement to be paid $15,000.00 per month for his legal services to MDB. Kelly alleges that he was deceived in New York, surrendered his right to a portion of that compensation in New York and subsequently performed services in New York for the lower fee, all to his detriment. This surely constitutes injury in New York.

For a fair analogy, we look to the Second Circuit's decision in *Hargrave*, 636 F.2d at 899–900. The plaintiffs in that case were a New York corporation and its president. They alleged that defendant, a California nursery, had fraudulently misstated the condition of certain of its vines and had thereby induced plaintiffs to purchase them for planting in New York. In contesting jurisdiction

under section 302(a)(3), defendant noted that the misrepresentation had been made in California and had concerned the condition of vines then located in California. It argued, citing the same line of authority as Malcolmson now relies on, that the only injury in New York was a financial detriment that resulted from the fortuity that the plaintiffs were based in New York.

In rejecting this argument, the Second Circuit declined to consider whether the "ill health" of the vines after their shipment to New York could be considered "injury" in New York for jurisdictional purposes. *Id.* at 899. Rather, it focussed on the fraudulent statement and observed that the most direct injury to the plaintiffs was the loss of the money paid to defendant in reliance on the assertedly false representation, a loss occasioned in New York, from where the money was paid out. *Id.* at 900. As the Court observed:

> That injury was immediately felt in New York where plaintiffs were domiciled and doing business, where they were located when they received the misrepresentations, and where the vines were to be shipped. So far as the record shows, the alleged false representations injured plaintiff in no state other than New York, certainly not in California. Indeed, the only state in which the plaintiffs had "property" which could sustain an injury was New York.

*Id.*

Having reached these conclusions, the Court in *Hargrave* went on to distinguish those cases, now invoked by Malcolmson, that rejected indirect financial loss as the predicate for jurisdiction in New York:

> This is not a case where a defendant commits a business tort such as unfair competition or diversion of opportunities in one state and the ultimate result is a loss of profits to the plaintiff which is fortuitously domiciled in another state.... In this case the immediate consequence which Oki foresaw, indeed which it sought to bring about by its sales representations, was payment to it directly by a New York domiciliary. Nothing could be a "closer" or more "direct" result from Oki's repre-

sentation than the extraction of money from plaintiffs in New York.

*Id.*

Our analysis here follows a similar path. On plaintiff's fraud claim—as distinct from his tortious interference claim—he does not allege actions by the defendant that cost him business in other states, with the ultimate, but indirect, impact being a loss of profits to a New York domiciliary. Rather, he alleges that Malcolmson transmitted a message to New York to induce him to agree, while in New York, to surrender a portion of his legal entitlement to compensation for future services, thus necessarily costing him money in this state to the extent that he did subsequently perform such services. Moreover, given the alleged fact that plaintiff was expected to and did perform his services for MDB in New York, and was professionally based in this state, it was evident at the time of the alleged fraud that the injury to him—in the form of under-compensated labors or, alternatively, labors that he undertook only on the misapprehension that MDB would not terminate the retainer arrangement—would be felt here if anywhere. *Accord, e.g., Cosmetech,* 943 F.Supp. at 319; *Pariente v. Scott Meredith Literary Agency, Inc.,* 1991 WL 19857, at '*3 (S.D.N.Y. Feb. 11, 1991); *Cavalier,* 687 F.Supp. at 879; *Marine Midland Bank,* 488 F.Supp. at 703.

In sum, as in *Hargrave,* we conclude that the alleged injury from the fraud occurred in New York. We therefore turn to the second set of statutory requirements that plaintiff must meet to assert jurisdiction under section 302(a)(3).

■ As previously discussed, a plaintiff suing for an out-of-state tort causing injury here faces two alternative tests under the statute. He must demonstrate either that the defendant

> regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

> [that he] expects or should reasonably expect the act to have consequences in the

state and derives substantial revenue from interstate or international commerce.

N.Y.C.P.L.R. § 302(a)(3)(i) & (ii). In this case plaintiff's allegations adequately establish a *prima facie* case on a portion of the second of these alternative grounds for jurisdiction, and he offers a sufficient basis for discovery concerning the balance of that test before the court considers dismissal on jurisdictional grounds.

For reasons already noted, we readily conclude that plaintiff has demonstrated that Malcolmson expected or should have expected that his allegedly fraudulent statement to Kelly would have "consequences" in New York. As for whether he derives substantial revenue from interstate or international commerce, the record is far murkier, but plaintiff has proffered sufficient facts to justify giving him the opportunity, by discovery, to determine whether Malcolmson meets this criterion.

We note that there is sufficient evidence at present to infer that MDB itself derives substantial revenues from interstate commerce.[8] Indeed, the nature of its business, as described by Kelly, so indicates, since it is allegedly engaged in providing information to hospitals across the country, including many in New York, concerning the acquisition of medical equipment. (*See* Kelly Aff. at ¶ 11; *see also id.* at ¶ 8). The more elusive question is whether Malcolmson, by virtue of his ownership interest in MDB and his role as Chief Executive Officer and President, or otherwise, also can be said to derive substantial revenues from such commerce.

In support of that contention, we note that Malcolmson, who is currently living in Arizona, is in charge of a Texas-based company that is concededly heavily involved in interstate commerce. From this premise, there is surely ground to suspect that he derives substantial revenues from interstate business, although Kelly does not attempt to estimate, much less specify, the magnitude of such revenues, either in gross terms or as a

share of Malcolmson's total revenues. Moreover, we note that in Malcolmson's two declarations submitted in support of his motion to dismiss, he does not assert that his financial circumstances preclude application of section 302(a)(3)(ii), even though his attorney briefly alludes to the issue in his reply memorandum of law. (Defs' Reply Mem. at 24).

Given these circumstances, we conclude that plaintiff may not yet have met his burden of proving with sufficient specificity the factual basis for applying this provision to Malcolmson, *compare, e.g., Cortlandt Racquet Club, Inc. v. Oy Saunatec, Ltd.*, 978 F.Supp. 520, 527–28 (S.D.N.Y.1997), but that the information necessary for this determination is in defendant's hands. We further conclude that plaintiff has offered a sufficient factual basis at this time to justify permitting him discovery of the defendant to test whether, as he surmises and we suspect, Malcolmson's earnings are sufficiently linked to interstate commerce to trigger jurisdiction in this state for plaintiff's fraud claim. *See, e.g., Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir.1990); *BHP Trading (U.K.) v. Deep Sea Int'l Shipping Co.*, 1991 WL 198747, at *5 (S.D.N.Y. Sept.23, 1991); *Dubied Mach. Co. v. Vermont Knitting Co. Inc.*, 1991 WL 84511, at *3 (S.D.N.Y. May 14, 1991).

(b) *Interference with Contract—Defendants Malcolmson, Robbins & Marriott*

Plaintiff's remaining claim is for tortious interference. Kelly's theory on this claim is that the three individual defendants, acting as officers, directors and shareholders, caused MDB to terminate its contractual relationship with him. He apparently construes such an action by them as tortious in nature, and he seeks to assert long-arm jurisdiction over them under section 302(a)(3). This effort is misguided.

The first problem with plaintiff's approach is his attempt to plead the commis-

---

8. The substantiality of a defendant's revenues from interstate commerce may be shown either on the basis of absolute figures or as a percentage of the defendant's total revenues. *See, e.g., Ronar Inc. v. Wallace*, 649 F.Supp. 310, 316

(S.D.N.Y.1986)(citing *Allen v. Canadian Gen'l Elect. Co.*, 65 A.D.2d 39, 42–43, 410 N.Y.S.2d 707, 709 (3d Dep't 1978), *aff'd*, 50 N.Y.2d 935, 431 N.Y.S.2d 526, 409 N.E.2d 998 (1980)).

sion by these defendants of a tort. As a general matter, a plaintiff cannot impose individual liability on a corporate officer or director because the defendant took actions in his official capacity that caused the company to breach its contract with the plaintiff. *See, e.g., Murtha v. Yonkers Child Care Ass'n, Inc.*, 45 N.Y.2d 913, 915, 411 N.Y.S.2d 219, 220, 383 N.E.2d 865 (1978). That is the extent of what plaintiff pleads, other than to add that this action was motivated by the defendants' desire to enhance the profitability of the corporation, a goal that is inconsistent with liability under this tort theory. *See, e.g., id.* (officer immune if he acted in good faith "as officer of corporation and [did not commit] independent tort or predatory acts directed at another") (citing *Buckley v. 112 Central Park South, Inc.*, 285 A.D. 331, 334, 136 N.Y.S.2d 233, 236 (1st Dep't 1954)); *Huebener v. Kenyon & Eckhardt, Inc.*, 142 A.D.2d 185, 191, 534 N.Y.S.2d 952, 956–57 (1st Dep't 1988).

 Apart from the evident legal inadequacy of plaintiff's pleading of this claim, there is a second, independent basis for concluding that he cannot invoke section 302(a)(3). As previously noted, the New York courts have consistently held that incidental economic damage to a plaintiff in this state by virtue of the fact that he is domiciled here does not suffice to permit assertion of jurisdiction over an out-of-state defendant. This principle has specific application to claims such as tortious interference, and generally precludes jurisdiction when the asserted injury is the loss of a customer outside of New York. *See, e.g., Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 94–95 (2d Cir.1975); *American Eutectic Welding Alloys Sales Co.*, 439 F.2d at 432–35. *See also Hargrave*, 636 F.2d at 900. Here, Kelly lost a client in Texas as a result of the actions of the individual defendants. New York's long-arm statute does not grant personal jurisdiction over nonresident defendants for such injuries. *See, e.g., American Eutectic* 439 F.2d at 433; *Walters v. Fullwood*, 675 F.Supp. 155, 159 (S.D.N.Y.1987).

Accordingly, the individual defendants' motion to dismiss should be granted with respect to plaintiff's tortious-interference claim.

### B. *Venue & Forum Non Conveniens*

Defendants also seek dismissal or a transfer of this action to the Northern District of Texas on the asserted basis that venue does not lie in this district. Alternatively, they seek a discretionary transfer under 28 U.S.C. § 1404. We address these arguments solely with respect to the contract claim against MDB and the fraud claim against Malcolmson. Based on our assessment, we recommend denial of this aspect of defendants' motion.

The pertinent venue provision is 28 U.S.C. § 1391(a), which provides as follows:

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

Plaintiff invokes the second of these three grounds to sustain his choice of venue with respect to both his contract-breach and his fraud claims. We conclude that he is correct on this point.

We start by noting that the cited provision, as suggested by its wording, permits the selection of a district in which "a substantial" portion of the relevant events took place, even if a greater portion of those events occurred elsewhere. *See, e.g., Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F.Supp. 731, 735 (S.D.N.Y.1996); *Neufeld v. Neufeld*, 910 F.Supp. 977, 986 (S.D.N.Y.1996). Both of plaintiff's claims meet this test.

 The contract claim is based on an agreement that was entered into by one party who was based in New York. Although executed in Texas in 1995, it was allegedly negotiated in part in this district. It was

then amended in 1996 in a written agreement that plaintiff acceded to and executed here. Moreover, the contract called for performance by the plaintiff that he allegedly carried out principally or exclusively in this district, as was apparently contemplated by the parties. Moreover, to the extent that defendant claims that it was justified in terminating the agreement, that assertion rests in principal part on plaintiff's alleged failure to be available in New York in late 1996 to provide services to his client. Finally, when defendant repudiated the contract, it did so by a written communication addressed and sent to plaintiff in New York. Under all of these circumstances, we view this district as one in which "a substantial part of the events giving rise to the claim occurred." *See, e.g., Geller Media Mgt., Inc. v. Beaudreault,* 910 F.Supp. 135, 138–139 (S.D.N.Y.1996); *Graf v. Tastemaker,* 907 F.Supp. 1473, 1474 (D.Colo. 1995); *Sacody Technologies, Inc. v. Avant, Inc.,* 862 F.Supp. 1152, 1157 (S.D.N.Y.1994); *Broadview Financial, Inc. v. Entech Mgt. Servs. Corp.,* 859 F.Supp. 444, 447 (D.Colo. 1994).

■ A similar analysis yields the same result with respect to plaintiff's fraud claim. The alleged misstatement was targeted at plaintiff in New York and allegedly caused him to rely in this district in three respects— by acceding to defendant's oral request to lower his fee, by executing the written agreement amending the 1995 contract, and by subsequently performing services here under the reduced-fee arrangement. Again, this satisfies section 1391(b)(2). *See, e.g., PI Inc.,* 907 F.Supp. at 762; *Nat'l Cathode Corp. v. Mexus Co.,* 855 F.Supp. 644, 647–648 (S.D.N.Y.1994); *Broadview Financial,* 859 F.Supp. at 447.

In sum, we conclude that venue is proper in this district. Since defendant alternatively suggests, albeit in passing, that the court should consider a discretionary transfer to Texas for the convenience of parties and witnesses, I briefly address that question.

The statute governing such transfers provides that: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might

have been brought." 28 U.S.C. § 1404(a). There is no dispute that this action "might have been brought" in the Northern District of Texas, since all defendants would be amenable to personal jurisdiction there and venue would have been proper under section 1391(a)(2).

Upon finding that the proposed transferee court provides a more convenient location for trial, this court has discretion to transfer the case to that forum. *See, e.g., Dwyer v. General Motors Corp.,* 853 F.Supp. 690, 692 (S.D.N.Y.1994) (quoting *In re Cuyahoga Equipment Corp.,* 980 F.2d 110, 117 (2d Cir. 1992)) (citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)). The movant must, however, persuade the court that the transfer is warranted based on the best interests of the litigants and the court, and does not merely shift the inconvenience from one party to the other. *See, e.g., IDT Worldwide, Inc. v. Supreme Int'l Corp.,* 1995 WL 702359, at *1 (S.D.N.Y.1995).

As a general rule, "motions to transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *In re Cuyahoga Equip. Corp.,* 980 F.2d at 117. The analysis involves an assessment of a host of practical considerations that reflect both the interests of the parties and the public interest. *See, e.g., Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

Among the considerations reflective of the parties' interests are the plaintiff's initial choice of forum, the convenience of the parties and the witnesses, the relative ease of access to sources of proof (including witnesses and documents), the availability of compulsory process to compel attendance of witnesses or to acquire tangible evidence, questions of enforceability of a judgment, if one is obtained, and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* 330 U.S. at 508. *See, e.g., IDT Worldwide, Inc.,* 1995 WL 702359, at *2; *S–Fer Int'l. Inc. v. Paladion Partners, Ltd.,* 906 F.Supp. 211, 212 (S.D.N.Y.1995). As for the public interest, the court should look to such matters as

possible exacerbation of court congestion resulting from the assignment of the case to one or the other of its potential venues, any local interest in having the controversy decided in the district that is the principal locus of the transactions in question, and the desirability of having a case involving state-law questions heard in a district that is familiar with the state law that will govern the action. *See, e.g., Gulf Oil,* 330 U.S. at 508; *S–Fer Int'l,* 906 F.Supp. at 213.

Defendants' request for a transfer, which can fairly be described as halfhearted, suffers from the fact that defendants fail to address most of these considerations and offer no specific support, either evidentiary or otherwise, for their request. Given the thinness of the argument, I address it only briefly.

### 1. *Plaintiff's Choice of Forum*

■ A plaintiff's choice of forum is entitled to considerable weight, and the party moving for a transfer must demonstrate that the "balance of the several factors is strongly in favor of the defendant." *O'Brien v. Goldstar Technology, Inc.,* 812 F.Supp. 383, 386 (W.D.N.Y.1993) (citing *Kolko v. Holiday Inns, Inc.,* 672 F.Supp. 713, 715 (S.D.N.Y. 1987)); *see also Dwyer* 853 F.Supp. at 694. Moreover, the deference given a plaintiff's choice of forum is particularly weighty when, as here, the plaintiff has selected his home state as the forum. *See, e.g., O'Brien,* 812 F.Supp. at 386 (citing *AMVEST Capital Corp. v. Banco Central, S.A.,* 628 F.Supp. 1258 (S.D.N.Y.1986)).

Defendants might be heard to argue—although they do not do so explicitly—that plaintiff's choice of venue in this case should not be accorded any deference because the events in question took place in Texas and California and have little or no connection to New York. For the reasons already noted, that is simply not the case. The key events took place in this state as well as Texas, and

hence plaintiff's choice is to be given substantial deference.

### 2. *The Convenience of Witnesses*

■ Convenience of the witnesses is often considered the most important factor guiding the decision whether to transfer. *See, e.g., In re Eastern District Repetitive Stress Injury Litigation,* 850 F.Supp. 188, 194 (E.D.N.Y.1994). In this case, however, defendants have failed to demonstrate that the convenience of the witnesses would, on balance, be served by the proposed transfer.

It is defendants' burden to specify the witnesses whose participation they contend is required and whose convenience they assert is being imperilled. *See, e.g., Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Howard v. Four Seasons Hotels, Ltd.,* 1997 WL 107633, at *2 (S.D.N.Y. Mar.10, 1997); *Car–Freshner Corp. v. Auto Aid Mfg. Corp.,* 438 F.Supp. 82, 85 (N.D.N.Y.1977). Defendants make no effort to do so.

In any event, we note that although MDB is located in Texas, and Malcolmson is domiciled in Arizona, plaintiff is based here. Moreover, since he carried out most of his work in this district, we anticipate that at least some other individuals located here might be called as witnesses to demonstrate, *inter alia,* that he performed his part of the agreement by rendering faithful services here and that he was available through his New York office even when he was appearing in a case in California.

Given the thinness of the record on this point, defendants have not shown why a transfer to Texas would better serve the convenience of witnesses than retaining the case in this district. It appears, rather, that a transfer would merely shift the inconvenience.[9] Where the result of a transfer is a mere shifting of inconvenience, transfer is not warranted. *See, e.g., Central Sports*

---

9. Convenience must be viewed in light of modern transportation, and a four-hour plane ride for a few witnesses is not sufficiently inconvenient to weigh heavily in favor of transferring this case. *See, e.g., Manu Int'l. S.A. v. Avon Products, Inc.,* 641 F.2d 62, 65 (2d Cir.1981) (citing *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 457 (2d Cir.1975) (Oakes J., dissenting), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976)).

*Army Club v. Arena Assoc. Inc.,* 952 F.Supp. 181, 189 (S.D.N.Y.1997).

### 3. *Access to Sources of Proof*

 Our analysis of the impact of a transfer on the parties' respective access to sources of proof largely parallels the preceding discussion. In practice, a transfer to Texas would not significantly affect the parties' ability to obtain evidence, although it would marginally shift the inconvenience from defendants to plaintiff.

Malcolmson and his fellow shareholders in MDB, who might be witnesses, are presumably available to testify at trial if needed and in any event can be made available for depositions either here or in their home states or in Texas. We have no indication as to whether defendants would seek to use the testimony of non-party witnesses, but even if so, they are presumably subject to *de bene esse* depositions if they cannot be made available here. Moreover, as already noted, we assume that any New York non-party witnesses would be similarly available to testify here, whether live at trial or by deposition.

As for documents, we assume that they are equally available to the parties irrespective of where the trial is conducted. Nonparty documents are provided through Rule 45 subpoenas irrespective of where the forum is located. The physical transportation of those records is also not burdensome, particularly in the absence of any indication that they are unusually voluminous. *See, e.g., Sunshine Cellular v. Vanguard Cellular Systems, Inc.,* 810 F.Supp. 486, 500 (S.D.N.Y.1992) (citing *Stinnes Interoil v. Apex Oil Co.,* 604 F.Supp. 978, 983 (S.D.N.Y.1985)).

In short, this factor does not weigh in favor of transfer.

### 4. *Availability of Process to Compel Witness Attendance*

 If key witnesses are not subject to the jurisdiction of the transferor court, but are subject to the subpoena power of a transferee court, this constitutes a consideration that weighs in favor of a transfer. *See, e.g., Arrow Electronics, Inc. v. Ducommun, Inc.,* 724 F.Supp. 264, 266 (S.D.N.Y.1989). The

weight given this factor must, however, depend on an assessment of the availability of alternative procedures for preserving those witnesses' testimony, the importance of having them testify live and the importance of other witnesses, whose live appearance may be prevented by a transfer.

As noted, defendants make no showing in this respect, and we have no reason to believe that any significant witnesses would be unavailable for testimony—either live or by deposition—if the case remained here. Moreover, to the extent that any of these witnesses offer testimony that may be controverted—in which case their credibility, and hence their demeanor, may be significant—defendants may use videotaped depositions to preserve a visual and oral record. *See* Fed.R.Civ.P. 30(b)(2); Fed.R.Civ.P. 32(a) & (c).

In this regard it bears noting that the federal courts have shown consistent sensitivity to evolving technology that may facilitate efficient litigation practices. *See, e.g., Weiss v. Wayes,* 132 F.R.D. 152, 153–55 (M.D.Pa.1990) (allowing use at trial of videotaped cross-examination of witness); *cf.* H.R.Doc. No. 201, 104th Cong., 2d Sess. at pp. 3–4, 9–21 (explaining amendments to Fed.R.Civ.P. 5 & 43 permitting electronic filing of court papers and use of contemporaneous video transmission of live testimony to courtroom from other locations). Present videotaping techniques can provide jurors high-quality pictures and sound, and thus go far in replicating the experience of viewing a witness live in the courtroom.

### 5. *Public Interest Considerations*

The remaining considerations pertinent to our analysis involve so-called public-interest factors. These concern the possible impact on court dockets from retention or transfer of the case, any local interests in the resolution of the controversies in question, and the desirability of having courts familiar with the applicable state law resolve those issues.

 In this case, defendants offer no suggestion as to why a transfer would serve any relevant public interest. Moreover, we note that there is little to be gained in terms

of relative burdens on the courts from transferring this case to the Northern District of Texas, as defendants request.

Recent statistics indicate that the median time from filing of civil suits to their disposition in the two relevant districts is not dramatically different. *See* 1996 Report of the Director, *Judicial Business of the United States Courts* at 165–66 (Admin. Office of the U.S. Courts) (median time to disposition is six months in N.D.Tex. and eight months in S.D.N.Y.). In addition, the very process of transferring the case would in all likelihood entail added delays, since the Texas court would need to familiarize itself with the case, and schedule conferences convenient for both parties. In addition, plaintiff and defendants may be required to hire local counsel in Texas.

■ A second public-interest factor to be considered is the relative interest of the forum and the proposed transferee district in the controversy. Concededly, Texas has an interest in regulating the contractual relationship between Texas residents and the attorneys whom they hire. It is equally evident, however, that New York has a significant interest in determining the ground rules under which New York attorneys may contract with clients and the extent of the protections that they may be afforded when the client seeks to terminate the relationship in asserted violation of a retainer contract. *See, e.g., Flynn v. General Motors, Inc.,* 141 F.R.D. 5, 11 (E.D.N.Y.1992) (New York "has a clear interest in providing a forum in which one of its citizens may seek to redress a wrong") (quoting *Fiacco v. United Technologies Corp.,* 524 F.Supp. 858, 861 (S.D.N.Y. 1981)); *Liamuiga Tours, Div. of Caribbean*

*Tourism Consultants, Ltd. v. Travel Impressions, Ltd.,* 617 F.Supp. 920, 931 (E.D.N.Y. 1985) ("it follows that as the case concerns a New York citizen, and apparently New York law, the community has an interest in its resolution"). Indeed, this point is underscored by the fact that, in seeking to dismiss the contract and fraud claims for failure to state a claim, MDB relies squarely and solely on New York substantive law. (*See* Defts' Mem. at 7–8; Defts' Reply Mem. at 1–9, 11–13).

On this same point, we note that the remaining public-interest concern emerges from the recognition that it is generally preferable for an adjudication to be conducted by a court familiar with the substantive law that will govern both the asserted claims and defenses. *See, e.g., Hernandez v. Graebel Van Lines,* 761 F.Supp. 983, 991 (E.D.N.Y. 1991). Since the parties appear to concur that New York law will govern both the contract and the fraud claims[10] (*see* Defts' Mem. of Law at 7–8; Plf's Mem. of Law at 4–6, 9–10), this factor favors retention of the case in this district.

### 6. *Conclusion as to Transfer Request*

The foregoing analysis compels the conclusion that defendants have not justified overriding plaintiff's choice of this forum. Accordingly, their request for a section 1404(a) transfer to the Northern District of Texas should be denied.

### C. *Failure to State a Claim*

Defendants' third proffered ground for dismissal is that Kelly fails to state a claim upon which relief can be granted. We have al-

10. Because this case was properly venued in this district, both this court and any transferee court would be obliged to apply New York State choice-of-law rules. *See, e.g., Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,* 87 F.3d 604, 607 (2d Cir.1996); *Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir.1993). *See generally Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). For tort actions New York law requires the court to conduct an "interest analysis test", under which the law of the forum with the greatest interest in the litigation will apply. *See, e.g., Softel Inc. v. Dragon Med. & Scientific Communications,* 118 F.3d 955, 967 (2d Cir.1997); *Schultz v. Boy Scouts of America.*

*Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985). Choice-of-law questions involving contractual disputes are resolved in New York by using the "center of gravity" or "grouping of contacts" test. *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997)(citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 612–14, 642 N.E.2d 1065 (1994); *In the Matter of Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 906–07, 613 N.E.2d 936; *Robins v. Max Mara, U.S.A., Inc.,* 923 F.Supp. 460, 465 (S.D.N.Y.1996)).

ready addressed the legal viability of the fraud and tortious-interference claims. Accordingly, at this point I consider the motion for a Rule 12(b)(6) dismissal only with respect to plaintiff's contract claim.

We start by noting the stringency of the standard that the movant must meet in order to obtain dismissal for failure to state a claim. In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. *See, e.g., Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996); *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.,* 101 F.3d 900, 903 (2d Cir.1996). So read, the complaint may be dismissed "only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Still,* 101 F.3d at 891 (quoting, *inter alia, Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *accord, Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 4–5 (2d Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2433, 138 L.Ed.2d 194 (1997). Applying these standards, we conclude that the contract claim should not be dismissed.

Kelly asserts that MDB breached the three-year retainer agreement when it ceased to pay him under it in October 1996 and then repudiated it two months later, even while acknowledging his satisfactory performance under its terms. Plaintiff's allegations suggest two different legal theories. The first is that the contract in this case was a three-year "general" retainer agreement, and that MDB's termination of it after paying only for the first year of services was without cause and entitles Kelly to the full value of the remaining two years of the term. The second theory, although not specifically articulated, is that even after the last payment by MDB, but before its repudiation of the agreement, plaintiff continued to provide valuable services to the client, and that he is entitled to compensation for those services.

In seeking dismissal, MDB presses the notion that the retainer agreement, if construed as binding it to pay plaintiff for the full three-year term,[11] is contrary to public policy. Defendant accordingly argues that the New York courts would decline to enforce it.

The central point of disagreement between the parties on this issue turns on their respective interpretations of a 1994 decision by the New York Court of Appeals concerning the ethical status of certain attorney retainer agreements that require the client to make an advance payment to the attorney that is not refundable even if the client terminates the relationship before the contracted-for services have been fully rendered. *See Matter of Cooperman,* 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994). To assess their arguments requires some background.

 The courts of New York and most other jurisdictions have long held that retainer contracts between attorneys and clients are subject to special rules that are an outgrowth of the attorney's role as a fiduciary and as an officer of the court. *See Campagnola v. Mulholland, Minion & Roe,* 76 N.Y.2d 38, 43, 556 N.Y.S.2d 239, 242, 555 N.E.2d 611 (1990); *Demov, Morris, Levin & Shein v. Glantz,* 53 N.Y.2d 553, 556, 444 N.Y.S.2d 55, 57, 428 N.E.2d 387 (1981); *Jacobson v. Sassower,* 122 Misc.2d 863, 864, 474 N.Y.S.2d, 167, 168 (1983), *aff'd on other grounds,* 107 A.D.2d 603, 483 N.Y.S.2d 711 (1st Dep't), *aff'd on other grounds,* 66 N.Y.2d 991, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (1985). Of particular relevance is the frequently noted principle that a client retains at all times the right to terminate the attorney-client relationship, whether with or without cause. As explained in the seminal decision of the New York Court of Appeals in *Martin v. Camp,*

That the client may at any time for any reason or without any reason discharge his

---

11. As in any contract breach suit, the remedy sought by plaintiff would permit defendants to reduce their exposure on the basis of plaintiff's successful efforts to mitigate damages by finding other legal work to fill the time that would otherwise have been occupied by Kelly's work for MDB. *See, e.g., Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 110 (2d Cir.1985); *Jones,* 21 F.3d at 22. *See also Cohen v. Radio-Electronics Officers Union,* 275 N.J.Super. 241, 645 A.2d 1248, 1253 (1994), *mod. & aff'd,* 146 N.J. 140, 679 A.2d 1188 (1996).

attorney is a firmly established rule which springs from the personal and confidential nature of the relation which such a contract of employment calls into existence. If the client has the right to terminate the relationship of attorney and client at any time without cause, it follows as a corollary that the client cannot be compelled to pay damages for exercising a right which is an implied condition of the contract.

219 N.Y. 170, 174, 114 N.E. 46, 48 (1916). To preserve the client's ability to exercise his right to end the attorney-client relationship, even if the termination was without cause, the Court of Appeals held in *Martin* that the terminated attorney is ordinarily entitled to be compensated only for the reasonable value of his services prior to the termination. *Martin*, 219 N.Y. at 176, 114 N.E. at 48. *Accord, Campagnola*, 76 N.Y.2d at 43, 556 N.Y.S.2d at 242, 555 N.E.2d 611; *Lai Ling Cheng, et al. v. Modansky Leasing Co., Inc.*, 73 N.Y.2d 454, 457–8, 541 N.Y.S.2d 742, 744, 539 N.E.2d 570 (1989); *Cook v. Moran Atlantic Towing Corp.*, 79 F.R.D. 392, 397 (S.D.N.Y.1978); Brickman & Cunningham, "Nonrefundable Retainers: A Response to Critics of the Absolute Ban," 64 U.Cin.L.Rev. 11, 16 & nn. 24–26 (1995)(citing cases).

In articulating these understandings in *Martin v. Camp*, however, the Court of Appeals recognized two significant qualifications that are of potential relevance here. The first exception is that the attorney's right of compensation is not limited to *quantum meruit* for pre-termination services if the relationship involves a "general" retainer, as distinguished from a "special" retainer. *Martin*, 219 N.Y. at 176, 114 N.E. at 48. The distinction is that under a special retainer the attorney is hired to deal with a specific case or other matter, *see, e.g.,* "A Response to Critics", 64 U.Cin.L.Rev. at 18; Brickman & Cunningham, "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. 1, 5–6 (1993); *Black's Law Dictionary* 1316 (6th

ed.1990), whereas a general retainer is an arrangement under which the client compensates the attorney to remain available to provide whatever services the client may require during a fixed term. *See, e.g., Gala Enterprises, Inc. v. Hewlett Packard Co.*, 970 F.Supp. 212, 216 (S.D.N.Y.1997); *Wong v. Michael Kennedy P.C.*, 853 F.Supp. 73, 79 (E.D.N.Y.1994); *Jacobson*, 113 Misc.2d at 283, 452 N.Y.S.2d at 984; "A Response to Critics", 64 U.Cin.L.Rev. at 19; "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 6.

As suggested in *Martin v. Camp*, 219 N.Y. at 176, 114 N.E. at 48, and more explicitly recognized in later cases, if the lawyer is terminated without cause under a general retainer, he is apparently entitled to be paid the total contract price (presumably less any mitigation of damages), and not merely the value of the services that he rendered prior to the termination. Indeed, the Court of Appeals recognized this principle explicitly in *Greenberg v. Jerome H. Remick & Co.*, 230 N.Y. 70, 74–75, 129 N.E. 211, 212–13 (1920), decided only four years after *Martin*, and the lower courts of New York have consistently followed that principle since then. *See Ehrlich v. Rebco Ins. Exchange Ltd.*, 198 A.D.2d 58, 58, 604 N.Y.S.2d 729, 729 (1st Dep't 1993); *Jacobson*, 113 Misc.2d at 283, 452 N.Y.S.2d at 984; *In re Scanlon's Estate*, 2 Misc.2d 65, 68, 150 N.Y.S.2d 511, 516 (1956); *Cohen v. Cocoline Prods., Inc.*, 150 N.Y.S.2d 815, 817 (N.Y.City Ct.1956); *Roth v. Rural Constr. Corp.*, 122 N.Y.S.2d 147, 148–49 (N.Y.City Ct.1953). *Accord, Alpern v. Hurwitz*, 644 F.2d 943, 945 (2d Cir.1981).[12] This follows from the observation in *Martin* that the untrammeled right of a client to terminate his attorney without financial consequence is limited to the special retainer relationship. 219 N.Y. at 176, 114 N.E. at 48.

■ There are two apparent rationales for this difference in treatment, although they may partially overlap. One is that un-

12. On its face, the decision in *Greenberg* could be read to apply only to employment contracts, such as for an in-house counsel. It appears, however, that in fact the case concerned a general retainer of an outside attorney, and the Court simply deemed that contract to be the functional equivalent of an employment contract, and the New

York cases have so interpreted it. *See, e.g., Ehrlich*, 198 A.D.2d at 58, 604 N.Y.S.2d at 729. *See also* Brickman & Cunningham, "Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory & Contract Law," 57 Fordham L.Rev. 149, 162–63 (1988).

der a general retainer the attorney is being paid first and foremost for his availability, and not merely for specified services. *See, e.g., Wong,* 853 F.Supp. at 80; "A Response to Critics," 64 U.Cin.L.Rev. at 20; "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 8, 23. *See also* DePippa, "Lawyers, Clients & Money", 18 U.Ark. Little Rock L.J. 95, 108 (1995). This is, however, not the only justification, or indeed the most compelling one, for the greater protection given the attorney in such circumstances.

The second is that under a general retainer the attorney commits himself to being available to a client over an extended period of time, without knowing in advance the nature and extent of the projects on which he will be obliged to work. That advance commitment without limitation may be far more disruptive to the lawyer's practice than a special retainer, which is confined to service on a specified matter. Because the general retainer involves far greater uncertainty about the extent of the client's future demands on his time, the attorney may not be able to commit a significant portion of his time to other clients and may therefore have to accept substantial restrictions on the balance of his practice or risk being unable to perform his obligations under the general retainer.[13] That added burden may justify greater protection for the attorney in such a circumstance if he is terminated without cause. *See, e.g.,* "A Response to Critics", 64 U.Cin.L.Rev. at 20–21; "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 9; *Cohen,* 275 N.J.Super. at 265, 645 A.2d at 1261 (Villanueva, J., dissenting). *Cf.* Lahey, "Employee or Attorney: The Appropriate Compensation Upon Termination", 20 J. Legal Prof. 251, 253–56 (1995–96) (discussing compensation for terminated in-house counsel).

▉ The second exception to the unconditional right of the client to terminate his attorney without cause is if the attorney has relied reasonably and to his detriment on a client's promises by changing his position or incurring expenses upon entering into the client agreement. *See, e.g., Ehrlich,* 198 A.D.2d at 58, 604 N.Y.S.2d at 729. This exception has also been recognized since *Martin,* 219 N.Y. at 176, 114 N.E. at 48, and appears to reflect the same notion that there may be circumstances in which the ordinary rule limiting attorney compensation to *quantum meruit* for services rendered would be inappropriately harsh and inequitable. *See, e.g., Greenberg,* 230 N.Y. at 74, 129 N.E. at 212; *Boehm v. United Power Laundries,* 132 Misc. 1, 4, 229 N.Y.S. 430, 433 (1928).

With this background in mind, we turn to the *Cooperman* decision. The appellant in that case was a New York attorney who had repeatedly entered into "special" retainer contracts with his clients and had included in those agreements a provision requiring an advance payment by the client that was designated as non-refundable in the event that the attorney was terminated prior to the completion of the project in question. *Cooperman,* 83 N.Y.2d at 469–70, 611 N.Y.S.2d at 466, 633 N.E.2d 1069.

Based on a client complaint, the attorney was the target of a disciplinary charge by the Grievance Committee for the Tenth Judicial District. After a referee had upheld the charges, the Appellate Division affirmed. *Cooperman,* 187 A.D.2d 56, 591 N.Y.S.2d 855 (2d Dep't 1993). On further appeal, the Court of Appeals in turn held that the non-refundability provision in Cooperman's special retainer agreements was improper and violated public policy, both because that requirement would compromise the client's unconditional right to discharge his attorney, *Cooperman,* 83 N.Y.2d at 473, 611 N.Y.S.2d at 468, 633 N.E.2d 1069, and because it would violate the provisions of the Code of Professional Responsibility limiting counsel to a "reasonable" fee. *Cooperman,* 83 N.Y.2d at 474–75, 611 N.Y.S.2d at 469–70, 633 N.E.2d 1069 (construing N.Y.Jud.Law, DR § 2–106(A)).

On its current motion, MDB asserts that the retainer agreement in this case, if en-

---

**13.** The degree to which the disruption factor is present may vary depending on the nature of the attorney's practice. *See, e.g.,* "Lawyers, Clients & Money", 18 U.Ark. Little Rock L.J. at 108 n. 86. In this case Kelly, who is apparently a single practitioner, alleges that his commitment to MDB required him to hire other counsel to handle substantial portions of a major lawsuit that was litigated in California in the Autumn of 1996. (*See* Comp. at ¶ 24).

forced as written, would saddle the defendant with the expense of paying Kelly for nearly two years of service that he will never render. In support of its motion to dismiss, defendant invites us to construe the *Cooperman* decision as prohibiting the enforcement of any retainer agreement—whether special or general—that would impose such an adverse financial consequences on the client if he chooses to terminate his counsel without cause. According to MDB, to do otherwise would impermissibly burden the assertedly untrammeled right of the client to change attorneys.

Although defendant's argument has some appeal, we conclude that *Cooperman* is not likely to be interpreted so broadly in New York. Moreover, even if that decision is ultimately applied to limit the enforceability of general retainers, in this case plaintiff has pled sufficient facts to suggest that he might ultimately be entitled to some relief in his favor on the basis of MDB's termination of the retainer agreement. Accordingly, dismissal for failure to state a claim would be inappropriate.

We start by noting that, when sitting in diversity, we apply state law in conformity with the holdings of the relevant state's highest court. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Sanchez v. United States,* 696 F.2d 213, 216 (2d Cir.1982). If that court has not spoken to the issue or has spoken in delphic terms, we may look to other sources of information to assist in predicting the course that the highest state court would take in deciding the issue before us. *See Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir.1994). Those sources include decisions of mid-level appellate courts of the state, as well as rulings by courts in other jurisdictions. *See Travelers,* 14 F.3d at 119; *Leon's Bakery, Inc. v. Grinnell Corp.,* 990 F.2d 44, 48 (2d Cir.1993).

In this case, as noted, the parties' briefing appears to assume, albeit without discussion, that New York law applies. In the absence of any dispute on this matter, and given the evident interest of New York in regulating the billing practices of its licensed attorneys, we follow the parties' lead in this respect and apply New York substantive law. *See Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir.1991); *Rolon v. United States Amada, Ltd.* 1997 WL 724798, at *2 (S.D.N.Y. Nov.18, 1997).

The precise impact of *Cooperman* on the enforceability of the contract in this case is less than clear from the face of the opinion. The issue presented to the Court of Appeals in that case, both by the parties and by the various *amicus* briefs, was limited to the question of whether an attorney could enforce a provision in a special retainer agreement that required a non-refundable advance by the client. (*See* Brief of Respondent Grievance Comm. for the Tenth Judicial District at 1–2, *Cooperman,* 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994) (No. 90–00429); Appellant's Brief at i; Brief for Amicus Curiae Lester Brickman and Lawrence Cunningham in Opp. to Resp–Appellant's Appeal at 6–7; Brief of Amicus Curiae The Assoc. of the Bar of the City of New York at 3; Brief of Amicus Curiae New York Council of Defense Lawyers at 3; Brief of Amicus Curiae New York State Bar Assoc. at 3). Indeed, the most detailed and apparently most influential *amicus* brief filed with the Court, *see* "A Response to Critics," 64 U.Cin.L.Rev. at 24–25, spent considerable space addressing the distinctions between special and general retainers and urged the Court to focus on the precise circumstances presented by that case. *See* Amicus Brief of Profs. Brickman & Cunningham at 6–7. *See also* "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 44 n. 26 (criticizing Appellate Division decision in *Cooperman* for not making clear that that court's holding applied only to special retainers).

For the most part, the Court followed that suggestion. Thus, in each instance in which it defined the issue for review and in each instance in which it specified its ruling, the Court was careful to note that the appeal concerned only whether a non-refundability provision in a special retainer agreement constituted a violation of professional standards for lawyers. *Cooperman,* 83 N.Y.2d at 469, 471, 473, 475, 476, 611 N.Y.S.2d at 466, 467, 468, 469, 470, 633 N.E.2d 1069.

■ This distinction appears entirely consistent with long-settled case law in New York upon which *Cooperman* squarely relied for its holding. The Court's rejection of the non-refundability provision rested upon the holding in *Martin v. Camp* to the effect that a client has an absolute right to terminate a special retainer. *See* 219 N.Y. at 174, 114 N.E. at 48. In *Cooperman* the Court concluded that the non-refundability of the required advance impermissibly burdened that right and thus violated the central tenet of *Martin.* 83 N.Y.2d at 473, 611 N.Y.S.2d at 468, 633 N.E.2d 1069. As we have observed, however, *Martin* explicitly rejected an unlimited right of a client to terminate a general retainer without adverse financial consequence, and thus implicitly recognized the right of an attorney to some form of contractual recovery upon the termination of such a contract for a term of years, a conclusion still more explicitly drawn four years after *Martin* in *Greenberg,* 230 N.Y. 70, 129 N.E. 211 (attorney retained for a period of years for a fixed annual sum is not an employee-at-will and discharge of attorney without cause gives rise to breach-of-contract claim).

In its analysis, the *Cooperman* Court did not purport to overrule this aspect of *Martin* and did not even mention *Greenberg.* The absence of such a holding in *Cooperman,* or even clearly stated *obiter dicta* to this effect, suggests that we exercise caution before assuming that the Court in *Cooperman sub silentio* overruled its own long accepted precedent. Moreover, as already noted, there are sound reasons to treat the special and general retainers differently in this respect, and those very distinctions were drawn to the attention of the Court in *Cooperman* by two prominent commentators on this issue who submitted a detailed *amicus* brief in support of affirmance. *See* Amicus Brief of Profs. Brickman & Cunningham at 6–7.

*See also* "Non–Refundable Retainers Revisited", 72 N.C.L.Rev. at 8 n. 26.

There is, however, one aspect of the *Cooperman* opinion that must give us pause.[14] Near the conclusion of its analysis, the Court sought to define the limits of its holding and to provide some reassurance that other fee arrangements would not necessarily be implicated by that holding. Unfortunately, however, the wording of this one paragraph leaves some question as to the intention of the Court. Thus it stated:

Our holding today makes the conduct of trading in special nonrefundable retainer fee agreements subject to appropriate professional discipline. [H]o[we]ver, we intend no effect or disturbance with respect to other types of appropriate and ethical fee arrangements (*see,* Brickman & Cunningham, Nonrefundable Retainers Revisited, 72 N.C.L.Rev. 1, 6 [1993]). Minimum fee arrangements and general retainers that provide for fees, not laden with the nonrefundability impediment irrespective of any services, will continue to be valid and not subject in and of themselves to professional discipline.

*Cooperman,* 83 N.Y.2d at 476, 611 N.Y.S.2d at 470, 633 N.E.2d 1069.

MDB apparently reads this passage, and particularly its reference to general retainers that are "not laden with the nonrefundability impediment irrespective of any services", as implicitly intended to prohibit any contractual recovery on a terminated general retainer that provides for services over a period of years. We are not prepared to read such a broad prohibition into this clause of the *Cooperman* opinion.

First, such a reading would effectively overrule the cited earlier precedent—including a portion of the very decision in *Martin* that the Court in *Cooperman* so centrally relied upon—and would do so without regard

14. Although *Cooperman* arose in the context of a disciplinary action against an attorney, subsequent cases have applied the reasoning of the decision to non-disciplinary contractual disputes over the payment of attorneys' fees. *See Gala Enterprises,* 970 F.Supp. at 217; *Wong,* 853 F.Supp. at 81. We agree with these courts that if a retainer provision is contrary to public policy and thus would justify disciplinary sanctions against the attorney who authored its terms, the courts of New York would not ordinarily enforce such a provision on a claim of a contract breach. *See Jacobson,* 122 Misc.2d at 864, 474 N.Y.S.2d at 168. *See also Restatement (Third) of the Law Governing Lawyers* § 46, cmts. a, c (Proposed Final Draft No. 1, March 29, 1996) (courts will not enforce fee agreement that violates disciplinary norms).

to the policy considerations that animated the previously recognized distinction. Second, in the paragraph directly following the above-quoted paragraph, the Court in *Cooperman* emphasized that fee arrangements other than the one at issue, if challenged on ethical grounds, must be judged "on an individualized basis." *Id.* at 476, 611 N.Y.S.2d at 470, 633 N.E.2d 1069. Third, we note that the quoted passage cites the very article, authored by Profs. Brickman and Cunningham, in which the distinction between special and general retainers is emphasized, with the accompanying admonition that general retainers should be treated differently from special retainers in this respect. *See* "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 8 n. 26.[15] Fourth, the court in *Cooperman* never touched on the other recognized exception to the *quantum meruit* rule, for a claim by the attorney to recover reliance damages. *See, e.g., Martin,* 219 N.Y. at 176, 114 N.E. at 48; *Greenberg,* 230 N.Y. at 74, 129 N.E. at 212; *Ehrlich,* 198 A.D.2d at 58, 604 N.Y.S.2d at 729; *Boehm,* 132 Misc. at 4, 229 N.Y.S. at 433.

▮ Under all of these circumstances, we conclude that New York law has not yet clearly departed from the notion that an attorney terminated without cause during the term of a general retainer may be entitled to an award, at least in some circumstances, beyond payment for the value of services already rendered. In reaching this conclusion, however, we take note of two possible counter-arguments, both derived from the commentaries of Profs. Brickman and Cunningham, that are pertinent to the particular agreement that Kelly entered into with MDB.

▮ In suggesting that general retainers are fundamentally different from special retainers, Profs. Brickman and Cunningham point to the observation that the fee paid for availability is "earned when paid." *See* "A Response to Critics," 64 U.Cin.L.Rev. at 20–21; "Living with the Ban on Nonrefundable

Retainers: Cooperman's Scope, Meaning and Consequences," 66–Oct. N.Y.St.B.J. 50, 51 (Sept.–Oct.1994); "Nonrefundable Retainers Revisited," 72 N.C.L.Rev. at 6, 9, 22, 24. This formulation derives from the recognition that when an attorney signs a general retainer agreement he makes two sacrifices—he agrees to turn down work opportunities that might jeopardize his ability to meet the retainer-client's legal needs, and he gives up the right to be retained by clients whose interests conflict with that of the general retainer client. From this observation Profs. Brickman and Cunningham suggest that a general retainer does not pose a nonrefundability problem, thus purportedly explaining the distinction drawn in *Martin v. Camp. See* "A Response to Critics," 64 U.Cin.L.Rev. at 20; "Nonrefundable Retainers Revisited," 72 N.C.L.Rev. at 9.

If this rationale for the distinction between special and general retainers were adopted here, we might conclude that Kelly cannot recover, since he was paid on a monthly basis, in each instance presumably for his availability only for the prior or forthcoming month. Because he is seeking a judgment compelling payment for the post-termination period, defendant might argue that the distinction drawn in *Martin* is irrelevant, and that Kelly is trying to enforce the functional equivalent of a non-refundability provision.

This assessment is, however, unconvincing. It bears emphasis that the Court of Appeals has not spoken directly to the circumstances that we confront, other than in *Greenberg,* and that decision suggests that the attorney may recover on a contractual basis. Moreover, the "earned when paid" explanation for the differentiation between special and general retainers does not lend itself to ready and consistent application. On the one hand, if the key concern is not to burden the client's right of termination, there is no reason why, as a categorical matter, any fee paid for availability in advance of the period in question should be protected from recoupment, since such a rule would plainly burden

---

**15.** As noted, in the cited article Brickman and Cunningham criticized the Appellate Division opinion in *Cooperman* for not clarifying that its holding does not apply to pure general retainers, that is, retainers in which a fee is paid for the availability of the attorney even if the client chooses not to call upon him for services. "Nonrefundable Retainers Revisited," 72 N.C.L.Rev. at 8 n. 26.

the client's right to terminate the contract. Because the terminated attorney was required to be available for only a portion of the contracted-for period, this scenario unquestionably involves an element of non-refundability, just as does a required advance for services not yet rendered. On the other hand, to preclude any payment for a terminated general retainer other than for pre-termination availability or services actually rendered would potentially work an undue burden on the attorney, for reasons we have noted.

In short, we do not view the exception for the general retainer as depending upon the fortuity of whether payment has already been made—a distinction that, we note, is nowhere mentioned in *Martin* or *Greenberg*. As Profs. Brickman and Cunningham suggest, the differing treatment of the general retainer is grounded principally in fairness to the attorney because the general retainer usually imposes more of a burden on the lawyer's practice. This is true, however, whether or not the client has already paid for the attorney's availability. Thus, the "earned when paid" rationale is not, we believe, the controlling rule in New York.

There is, however, a second potential argument for defendant's position that we must also address. Some commentators have drawn a distinction between a "pure" general retainer, which requires payment only for availability, and thus envisions a separate payment for services actually rendered, and a so-called "hybrid" general retainer, which provides for a single payment that may cover both availability and rendition of services. *E.g.*, "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 6. As noted, Brickman and Cunningham suggest that the pure general retainer does not pose the same non-refundability concerns as a special retainer because the payment is for availability. *Id.* In contrast, they note that under a hybrid general retainer some portion of the payment is assumed to be for services. If the client terminates a hybrid general retainer early, they assert, the attorney may be seeking to retain monies for services never rendered, thus posing a problem analogous to that confronted in the special-retainer case. For this reason

they have argued that enforcement of a hybrid general retainer should be subject to close scrutiny, governed by a rebuttable presumption that any monies retained by counsel are for services rather than for availability. *See id.* at 27. Moreover, in the wake of the Court of Appeals decision in *Cooperman*, they have gone so far as to argue that that decision creates an absolute prohibition against enforcement of the hybrid general retainer. *See* "Nonrefundable Retainers: A Response to Critics," 64 U.Cin.L.Rev. at 22–23.

■ Kelly's retainer provided for monthly fees, which apparently were intended to compensate both for availability and for services rendered, and thus comes within the so-called hybrid category. Defendant in this case might be heard to argue, on the basis of the most recent exegesis by Brickman and Cunningham, that *Cooperman* bars its enforcement, if only because some portion of the disputed fees was for services.

The short answer to this approach is that *Cooperman* did not address the proposed distinction between pure and hybrid retainers, much less preclude any possibility that a terminated attorney might obtain some measure of relief if his relationship with the client was governed by a hybrid retainer. Moreover, the proposed distinction itself does not provide any ready justification for precluding any recovery by Kelly.

First, it is not clear whether the holding in *Cooperman*, which addressed the problem of non-refundability in a special retainer, can be routinely applied to negate a provision in a general retainer requiring future payments for a term of years when the client terminates in the middle of the term. *See Cohen*, 146 N.J. at 165, 679 A.2d at 1201 (enforcing a limited notice provision in a general retainer); *Cohen*, 275 N.J.Super. at 273, 645 A.2d at 1266–67 (Villanueva J., dissenting). Second, if we accept the premise that hybrid general retainers and special retainers are equivalent, *see* "Nonrefundable Retainers: A Response to the Critics," 64 U.Cin.L.Rev. at 23; *see also* Pamela S. Kunen, Note, "No Leg to Stand On: The General Retainer Exception to the Ban on Nonrefundable Retainers Must Fall," 17 Cardozo L.Rev. 719,

23 (1996), then even a pure general retainer could be viewed as having a non-refundability problem because, if it is terminated early, the attorney would be entitled under the contract to be paid for future availability even though he will not be required to be available.

Third, we note that if a fee payable for an attorney's availability is deemed recoverable by counsel, then in the case of a hybrid general retainer a court could presumably make an allocation of the fee and order recovery of so much of it as would reasonably reflect the attorney's commitment to be available for the client, as distinguished from the amount that may be allocable to anticipated services. *See, e.g.*, "Nonrefundable Retainers Revisited", 72 N.C.L.Rev. at 27–28; *Cohen*, 275 N.J.Super. at 266–67, 645 A.2d at 1262 (Villanueva, J., dissenting). *Cf. Cohen*, 146 N.J. at 165, 679 A.2d at 1200. If a general retainer for availability is enforceable, as suggested in *Martin* and *Greenberg*, we see no reason why that portion of a hybrid retainer that pertains to availability should not also be recoverable, and we see nothing in *Cooperman* to undercut that assumption. Moreover, we note that even Profs. Brickman and Cunningham, prior to *Cooperman*, assumed that there would be some inquiry by the court to determine whether a portion of the hybrid fee was properly allocable to availability as distinguished from services. *See* "Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory and Contract Law," 57 Fordham L.Rev. at 159. Although they proposed use of a rebuttable presumption against allocation, *see* "Nonrefundable Retainers Revisited," 72 N.C.L.Rev. at 27, plainly that process involves some fact-finding, and would be inconsistent with dismissal as a matter of law.

Fourth, application of damage mitigation principles suggests that a recovery for that portion of the so-called hybrid retainer that pertains to availability would be limited to compensation for the adverse impact of the retainer on the attorney's general practice and any outlays that he made in carrying out or preparing to carry out the contract. This appears to be equivalent to a recovery under *Martin*'s recognized exception for an attorney's justified reliance on a retainer agreement. *See* "Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory and Contract Law," 57 Fordham L.Rev. at 158.

In short, we do not view *Cooperman* as precluding, as a matter of law, any contractual recovery by an attorney on the basis of the type of general retainer at issue here. The New York Court of Appeals decision in *Greenberg*, which has not been overruled, suggests that plaintiff might conceivably enforce the full term of the contract, less mitigation. Moreover, even if the continuing validity of *Greenberg* is open to question, this would not justify dismissal as a matter of law.

In the arguable absence of controlling New York case law on the point, we note that the New Jersey Supreme Court recently addressed an analogous general retainer. In that case the Court held that whether the terminated attorney was entitlement to more than *quantum meruit* for services already rendered should turn on an evidentiary assessment of a variety of factors, including the sophistication of the client, the course of negotiations, the extent of the economic burden on the client of requiring compensation beyond *quantum meruit*, and the degree to which the attorney may have reasonably relied on the general retainer. *See Cohen*, 146 N.J. at 160–65, 679 A.2d at 1198–1200 (requiring compensation for one month beyond termination of retainer, when contract authorized termination but required six-month notice period). That form of analysis is not unique, but rather reflects the terms of the most recent version of the pertinent *Restatement. See Restatement (Third) of the Law Governing Lawyers, supra*, § 46 cmt. e (identifying relevant factors in assessing retainer agreement), *id.* § 52(2) & cmt c, & illus. 2 (suggesting court discretion whether to award contract damages or some portion of them). We suspect that, if called upon to determine the question, the New York Court of Appeals would follow a similar course.

Apart from the potential enforceability *vel non.* of a general retainer under *Martin* and its progeny, plaintiff may have other bases for a recovery in this case. As noted, New York apparently still recognizes that an attorney may recover if he has changed his

position in reliance on the retainer. *E.g., Ehrlich,* 198 A.D.2d at 58, 604 N.Y.S.2d at 729. In this case plaintiff alleges that when he went to California to appear in an unrelated civil case, he made special arrangements to farm out part of the work in order to ensure his continuing availability for the needs of MDB. (*See* Compl. at ¶ 24). If in fact plaintiff undertook expenses or chose to forego payments by other clients in order to accommodate his obligations under the general retainer, this would provide a separate potential basis for recovery beyond a *quantum meruit* award for past services.

Finally, we note that plaintiff alleges that he performed various services under the retainer after the last payment by MDB in October 1996 and prior to the termination in December 1996. (*See* Kelly Aff. at ¶ 17). Since he alleges such uncompensated performance, he states facts that, if proven, would suffice to justify a recovery, whether on the basis of contract or of *quantum meruit.* These allegations suffice for present purposes to state a claim, since the adequacy of a complaint challenged under Rule 12(b)(6) is to be assessed on the basis of its factual allegations rather than the legal labels affixed to those allegations. *See, e.g., Haddock v. Board of Dental Examiners of California,* 777 F.2d 462, 464 (9th Cir.1985); *In re Harvard Knitwear, Inc.,* 153 B.R. 617, 625 (Bankr.E.D.N.Y.1993).

## CONCLUSION

For the reasons stated, defendants' motion to dismiss should be granted in part and denied in part. Specifically, we recommend that the motion be granted with respect to the claim for tortious interference for lack of personal jurisdiction and failure to state a claim. With regard to the contract-breach claim against MDB and the fraud claim against Malcolmson, we recommend denial of the motion since the complaint states legally viable claims and this court has personal jurisdiction over those two defendants on these claims. Finally, we recommend denial of defendants' application to dismiss or transfer on the basis of improper venue or *forum non conveniens.*

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Kimba M. Wood, Room 1610, and to the chambers of the undersigned, Room 1670. Failure to file timely objections will constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Feb. 4, 1998.